You should be pleased to know, counsel, both of you, that Judge Nelson and I have been here all week, and so we saved the best for last, so. Well, thank you, Your Honor. May it please the Court? What's the final argument today? We were speculating in the back that perhaps we were the final argument. I think we were also speculating in the back that perhaps we should have waived oral argument, but either one of us... No, you don't want to do that on this case. I mean, now, we've, you know, both Mr. Dahmer and I, I think, like to talk a little bit, and we've had the opportunity over the last four years to spend a lot of time together, actually. Looks like. It looks that way. Well, it's true. Your Honor, may it please the Court? What we have here is really a question of the application of Daubert and whether it was appropriate or applied in this case, both as a matter of law, and then if you look at the correct standard, whether it was – whether there was an abuse of discretion by the Court in excluding the expert testimony of Mr. Lippincott, Dr. Parisian, and the causation testimony of Dr. Gannon, who was the treating physician. Well, the treating physician testimony, he didn't exclude that based on Daubert. Well, he – no, you're right. He excluded that based on... I look to me like the district court judge treated the treating physician testimony just differently as an expert. He did. He didn't submit – they didn't submit an expert report. No. We did not. In fact, that's exactly right. He kept that – he treated that uniquely different. Right. And then he treated the other experts basically – he basically didn't. I think he did a Daubert. I'm not exactly sure what he did. He did a Daubert analysis, I believe. Well, if he didn't, he was required to. A Daubert analysis on Dr. Parisian and Mr. Lippincott. As you'll note, the Daubert analysis... Well, why don't we talk for – at least it might be easier if we just look at – let's take up the treating physician. That would be great. The treating physician, the issue there was whether or not an expert report had to be submitted. And the Court had issued a pretrial order that basically said there was no requirement for an expert report to the extent the opinions were already stated in the medical record. And the contention that I have made is that, in fact, Dr. Gannon in his medical record did state his causation opinion and stated it fairly clearly. That is, Dr. Gannon stated in the medical record, as we've cited, that this particular implant failed due to basically the substrate, the roughening of the stem. I believe he had to correct his medical record. But basically the roughening of the stem. And what happens when these stems loosen, and that's really the crux of this matter, when these stems loosen, you have a roughened stem, which basically acts as sandpaper in there. And so what it does is kind of goes up and down inside that cement mantle. And generates debris. Small, very small debris. Which, of course, is the bad kind of debris. Because small debris is biologically active. And that set off this whole process of osteolysis, bone death, which then leads to the ultimate failure of the implant. And in this case leads to the failure of the implant. So let me ask you this. So let's assume you had Dr. Gannon on the stand. Yes. And he goes through his whole treatment and diagnosis. Right. Comes to the point sort of right at this critical moment. Yeah. What was your question that you wanted to ask the doctor? In your opinion. Are you going to ask in your opinion? Yeah. In your opinion. What was the cause of the breakdown? Yes. Yeah. In your opinion. Well, no, in your opinion. Why did the implant fail? Why did the implant fail? And what he would say, and what he did say in his deposition testimony, because Mr. Don had the full opportunity to depose Dr. Gannon well before hearing. Did he express that opinion in his deposition testimony? He did. Express the reasons for the opinion in his deposition testimony? He did. This was long before the trial date? How long before the trial date? Nine to ten months. Nine to ten months. Yeah. I believe my recollection, if I'm right, Bert, is that Dr. Gannon's deposition was taken about two months after the disclosure in May. Well, your testimony right now may have... It was a long time. My understanding of this record is that the trial judge relied entirely on the failure to file a report required by his order as the reason to disallow the testimony of these two physicians. Is that correct? That's my understanding. Their qualifications were not challenged under Daubert. No. Well, they were, but I don't think the judge ruled on them. They were both definitely fact witnesses. That was my allegation. Because one did the original operation and one did the replacement. Exactly. Is that correct? No, that's exactly right. And so they were fact witnesses, but Dr. Gannon expressed an opinion about the causation of this hip replacement, hip failure, in his deposition and stated his reasons for it. Right. And those reasons were also in the medical record. Yes, I believe they were. As a matter of fact, he specifically discussed the substrate roughness in the medical records, and what he testified to in his deposition is that he... My client is also an engineer. He's a professor of engineering at Montana State University. And based on both what my client had told me beforehand, and I believe testified to, and what Dr. Gannon testified to, is that Dr. Gannon basically said, Bob, here's the reason that this thing failed, and this is consistent with what I'm seeing out in the literature. So, I mean, he had implanted, Dr. Gannon, that is, had implanted a couple of these central line stems, and it was starting to be well known out in the community, frankly. I mean, all these doctors go to these general meetings. For Montana, you probably don't get to as many of the national meetings as you would from Minneapolis. But, yes, so... You weren't going to ask him all the design questions, were you? No, I was going to ask him why it failed and, in essence, what the cause of it was. It's really then, you know, you then hook that together with what Mr. Lippincott and Dr. Parisian had to say about the design, and more specifically what they were going to discuss is the medical literature and the testing that had been done, especially Mr. Lippincott. When you take a look at the literature that was known both before this stem was developed and then after this stem was developed, and, frankly, which ultimately led for Zimmer to pull it off the market and kind of put that all together, so you've really got bits. So Dr. Gannon, what he was really going to address is what he saw and what he knew, because, of course, he didn't go out and do the research on this issue, nor did I ask him to, nor, frankly, with most treating physicians, if you went and asked them to retain them and give you a report, would they do it? I mean, it's just the nature. Treating physicians see lawyers coming and don't exactly run and embrace us. From their standpoint, there's a level of which we're something they have to deal with but not necessarily want to deal with. But on this case, we have no Doebert questions with respect to Drs. Gannon and Humberter, but the Doebert analysis comes in with respect to Lippincott and Dr. Parisian. Yes, exactly. Yes. And you're saying that the district court judge abused his discretion in the Doebert analysis? Yes. All right. And because? Well, a number of things. First of all, I believe that as to qualifications, Mr. Lippincott and Dr. Parisian were qualified, in fact, had been found qualified in a very similar case involving the same set of implants by the district court in Minnesota, Judge Thunheim presiding. Judge Thunheim has experience with medical devices. He is the multidistrict litigation judge in the St. Jude heartfelt cases. His ruling is not binding on the? No, it's absolutely not binding. But I think it does, though, present an interesting legal issue, though, doesn't it? I mean, how can you take, in essence, the same experts on the same case and have one judge who has four cases and a multitude of other cases, but four of my cases, and basically say it's admissible and another judge who can't, looking at exactly the same case? One judge is wrong. Let me acquaint you with my experience. I'm sorry, sir. I will acquaint you with my experience. Sure. I mean, there are a lot of hired gun experts out there that advertise in the trade journals offering lawyers testimony in particular types of cases who have never really had the proper experience of qualification. I had a case just like that. Sure. And I excluded that the Supreme Court said that the gatekeeping function belongs to the trial judge, given broad discretion in that respect. Are you saying, can you point specifically why those Daubert rulings, other than this, are you relying entirely on the Minnesota that these people had previously testified in another case? No. What else? Absolutely not. Let's talk about Mr. Lippincott's qualifications, and let's talk about the issue you just talked about, experts being for hire. This is the first plaintiff's case Mr. Lippincott ever did. The fact of the matter is Mr. Lippincott was found qualified by the industry. Why? Because they hired him for some 15 years to do exactly this, to design various orthopedic implants. That's what he did after getting his degree out of Purdue in engineering. He went out and he worked for the implant companies. He worked for Deploy, where he was trained in implant design. He, in fact, conducted some implant design. He then went to a startup company, Orthamet, where he was asked to design a femoral stem. Now, this particular femoral stem, and he, in fact, designed two, the Proforma and the Perfecta. They were reverse engineered off to another, Osteonics, stem that was also out there on the market. But he still designed them, and he looked at it and he undertook the design process. And, in fact, that stem was used with cement. Was it designed specifically for cement? No. What is your understanding of the judge's reasons for rejecting this testimony under Adulthood? Well, there are a couple. Number one is I believe he found Mr. Lippincott to not be qualified for a number of reasons. One, he said that this is an intersection of medicine and engineering, and that since Mr. Lippincott is not a medical doctor, he isn't qualified. Number two, he looked at him and he said because he hasn't specifically designed from the ground up a femoral stem, a cemented femoral stem, I mean, he has designed a femoral stem, a cemented femoral stem, he is not qualified. Second, I think he looked overall at what he believed to be Mr. Lippincott's credibility. He went into detail into how the report was written and the opinions expressed. For instance, he was offended by the fact that Mr. Lippincott stated that some of the assertions made by Zimmer in marketing this stem were ultimately false and unsupported by the testing. He said he took bits and pieces from here and from there. Didn't he also say he distrusted it? He questioned the credibility because he, Mr. Lippincott's opinion was developed for the purposes of this litigation. Right. He did state that. But that's not an objection that justifies excluding testimony. I mean, this Court, this circuit has held under metabolite that you can, in fact, have an in-the-library opinion. Did he hold a 104 hearing in each of these cases? Just Mr. Lippincott. Mr. Lippincott. Well, a 104 hearing, if you're talking about having the witness come in and appear, just Mr. Lippincott. Evidentiary hearing. Yes. Just Mr. Lippincott was brought in to testify, and he was only really allowed to testify about his qualifications. We didn't get into the substance, really, of his opinions. But, again, when you come back to it, getting into whole issues. The other witness was not. Dr. Parisian was not. He was not subject to cross-examination or testified at all. Well, I mean, both of the witnesses had their discovery depositions taken. And Mr. Dahm, and I believe I did as well, gave that information to the Court and put that in in terms of the briefings themselves. But that's really kind of the part and parcel of it. Dr. Parisian was not called in. So basically, the district court didn't say under Daubert that the methadol – well, I don't know. Maybe he did. I'm not quite sure exactly what he did. But he didn't. In other words, he basically found Lippincott not qualified. He found Lippincott not qualified, but in so doing, he also cast seriously a doubt, as I read the transcript, on the opinions rendered, which is really going beyond as to the conclusions rendered, and really got into credibility issues, which is an issue of fact for the jury. It's not an issue for the judge. Is Lippincott the one whose qualifications you cited earlier? Yes. That worked in the industry? Yes, he did. Yeah. He was a vice – worked for OrthoMet, then went out, then came back. He was actually working with OrthoMet, which was brought out by – What were the opinions – just so I make sure I understand – the opinions you wanted to ask? You had him on the stand in front of the jury. What was the – Only the causation evidence? Sure. What was the opinion you were going to ask? There was a number of opinions. If you've taken a look at the expert report, it goes on for about 20-some pages, but basically it came down to this. Was this implant defective? That is, was it safe? And was there negligence? Was Zimmer reasonable in designing this implant? And it really was going to come down to, based on the information that Zimmer had available to it in 1999 and then threw up, did they undertake reasonable testing? Did they make sure their design was valid? Was their design, in fact, valid? Did this implant, in fact – was it more dangerous to people than other implants already on the market? You know, and was that done through the various testing? And the support of that, frankly, was the published literature and Zimmer's own testing done after they started getting notice of problems with this implant. Problems with a hip implant is what tends to happen. This is a classic example. You market the implant. It gets implanted in a couple hundred thousand – well, about 10,000 people, give or take. And then you kind of see what happens. In this case, what happened is predecessors of this particular implant, the Central Line, the Harris Precote, and the Harris Precote Plus, had started to fail. And that was now being published in 1995. So we're going to go through all those as well as causation and the failure, the manner, the mechanism of how these implants fail, unique to this design as compared to how other designs fail. And then, of course, a specific application of that to whether or not the failure of Dr. Oakberg's stem was consistent with what was being reported in the literature and the subsequent testing. Now, do you understand the district court saying he wasn't qualified for one of the reasons he wasn't qualified is because he also didn't have a medical degree? That was one of the things that he talked about. Yeah, the court said that this is an intersection of engineering and medicine, and he doesn't have a medical degree. Well, but this – he was not going to express any medical opinion, was he? No, he was going to really express an engineering opinion on causation. The manufacturer and the process and the – he was going to express an opinion about the defect in the product? Right. And he would express also a causation opinion involving the mechanism by which these fail. That the defect in the product caused the deboning that occurred? Right, the bone destruction. Yeah, the particleization and bone destruction. Was Dr. Oakberg also going to express that same opinion? Yes, but on a different basis from a different standpoint. Let me ask you this. If you didn't have Dr. Lippincott and Dr. Parisian – I mean, Mr. Lippincott and Dr. Parisian? Yeah. And you only had the treating doctors? Did you have any other experts? Is that it? No, that was it. Let me ask you. So if you just have the treating physicians on causation, is that enough? Yeah. No, not – I need an expert. Under Montana law, it appears that you need an expert on design defect, and so I would have needed – That was Lippincott. That was Lippincott. How about Parisian? How did she fit into this? Parisian was a medical doctor and pathologist who worked for four years with the FDA and did health risk assessment. Some of her expertise crossed over Mr. Lippincott, but she's taking it more from the kind of generic global view. What she did at the FDA, she did 162 health risk assessments where they basically look out and say, you know, the FDA always gets notice of when devices start to fail, and so one of the things you start to say is, is it failing at a greater rate? Your proposed testimony didn't seem to me as important as Mr. Lippincott's. Well, in the end, it actually overlapped. I think what Dr. Parisian brought, but ultimately the Court excluded, was specific expertise with regard to the FDA. This particular stem, as well as all its predecessors, going back 10 years, had never been submitted to the FDA for 510k approval, but she also had expertise as to what the FDA and people like that expect, and she would also do the causation analysis. That's what we would call general causation, that health risk assessment. Is Dr. Gannon's opinion sufficient on causation to allow you to go forward? I think Dr. Gannon's opinion gets me to a jury, but I think on causation, I still think you need, well, I still think there needs to be some interaction between the mechanisms. All you need is one witness on causation. Yeah, that's all you need. Yeah. That's all you need. And Dr. Gannon, I think, is sufficient on especially specific causation. I guess I would break the case down into a general causation versus a specific causation, and what Lippincott's really going to talk about, and Parisian can as well, is a general causation that is a mechanism of failure. What Dr. Gannon says is, I mean, he's the guy that went in there and looked at it and took it out. He knows exactly how it failed and what it looked like. He may not know how the design necessarily played in that, but certainly can say, here's why this particular implant failed in this patient. Would you like to save the two minutes for rebuttal? I sure would, if that would be okay. Thank you. May it please the Court, good morning. I'm Bert Daum, and I'm honored to be here this morning on behalf of Zimmer. Counsel, we're here today, obviously, to ask this Court to affirm the trial court's grant of summary judgment. We believe the trial court correctly exercised its broad grant of latitude, which it has when it looks at the court. It's not unlimited. It didn't say unlimited. I did say broad. And this Court, now in its deferential role as a reviewing court, looks to see whether or not it's an abuse of discretion. And the Court's absolutely correct. What some other court did on another given day with a set of excerpts is of no moment. It's not relevant at all, frankly. And, indeed, in that court, there was no Dawbert hearing of any type. Here, however, we had the trial judge, the district court, conduct a series of hearings, starting with the first and limiting hearings in November, culminating in the bringing in of Mr. Lippincott under oath in January, and that led then to the summary judgment disposition in February. I think some context is in order this morning, and I brought with me, and Mr. O'Fallon has seen it, the stem. This plaintiff, Dr. Oakberg, has come in here with two experts, Dr. Parisian, whose only qualifications are based on her four-year stint at the FDA. And she admits, we cited in the record, that she would have no basis to even begin to write the report that she did but for her work at the FDA. And then they bring in Mr. Lippincott, who's a metallurgist, a bioengineer, and it's not even clear today what that is. And this gentleman and this lady come into the court and say, we have resolved the controversy that exists in the medical community. And it's a true medical controversy, and that is, what is the optimal surface finish of a stem that goes into a person's hit, a cemented stem? Some are roughened like that particular stem was. Some are polished, and some are smooth. It's a different school of thought as to how the stem should work in the bone. Mr. Lippincott, who has never studied this issue before, admittedly, never thought about the central line, admittedly. Dr. Parisian never heard of the central line prior to the retention in this case. As we know, this, their opinions were not generated by the research they did independent of the courtroom. They were generated solely for the courtroom. So what we know from Daubert, too, is the trial court is charged with its gatekeeping responsibility. They come in and say, well, if you look at this stem, and it's in the record, photographs of it are in the record. It's a little tough to make out. Pages 263 and 264 of the record, there's some photographs of the stem. But if we look at the top portion, or the proximal portion, there's an area called macro texturing. And the design theory behind macro texturing is it helps the cement that's placed in the canal interdigitate and affix to the stem. So we have a good interface. And then we also have a roughened stem. If you want a good, strong interface, that school of thought goes, you have a strong, you make it as rough as you can so that it tries to bond. Another school says, look, we don't believe you're ever going to keep stems firmly fixed, given how active folks are, given how much folks weigh in our society and the like. And so we think they're going to loosen, so make them smooth so that if they do loosen, you don't have the micro motion between the two interfaces. So there's a legitimate controversy. Mr. Lippincott, never having studied the issue, says, based solely on an examination of articles written by others, the conclusions of which he draws were absolutely undercut by the authors of those articles. We submitted affidavits from authors of at least half a dozen of those authors or articles who said you cannot draw, and we haven't even drawn, the conclusions that this witness is attempting to draw from our work. So he's never looked at it before. And so we don't have the first indicia of reliability as Daubert II teaches. And so we have to look for something else. Well, did they submit their opinions that no stems sold in the United States should be roughened, they all should be smoothed to peer review? Did they ever publish that work? They did not. So we don't have those two primary indicia of reliability. Counsel, my quarrel is not so much with the Daubert ruling, but the real key ruling in this case was the dismissal, that is to say the denial because of a failure to file a report pursuant to a pretrial order, the denial of these two doctors, the treating doctor, the one who did the original implant, the one who did the replacement implant, to testify based on the failure to comply with a pretrial order, which is a little bit ambiguous. But without any apparent prejudice to you, according to counsel who argued before you, the deposition of this doctor was taken from eight months before. He had expressed those opinions about the implant and about the defective condition of it and you had the opportunity to cross-examine him. He gave his reasons for the opinion. And yet on the basis of this rule, the violation, the court said, well, the jury may not hear this evidence, either the fact evidence of these two doctors or this opinion testimony. That's the part that's troubling to me because, you know, these rules are meant to make trials more efficient, to avoid sandbagging, to give everybody have notice of what's going on. But they constantly, defense lawyers sometimes, sometimes it's the others, will argue to exclude evidence because it was not reported in the report. Well, those reports were not intended to cover every little item that needed to be reported. So my question to you is, how were you prejudiced by the failure to file a report pursuant to the court order? I mean, isn't that something the court could have sanctioned the lawyer for? It does not appear to me that you suffered any prejudice from the failure to file that report and that the sins of the lawyer, if any there were, should not fall on the client. But that seems to be what had happened here. Well, I think, first of all, Your Honor, the District of Montana follows that general rule. Compliance with its trial orders, right or wrong, is expected. That's the expectancy of the District of Montana. So in terms of the prejudice, it's not only the prejudice to me. It's also the prejudice to how the court expects the litigants in its courtroom to run, number one. Number two, I would have taken a much different deposition of Dr. Gannon. Now, we heard today in response to the Court's question, well, is this a precipient witness? Well, if this is a witness offering lay testimony under 701 ---- Well, he's a doctor. He's not going to be ---- he's not going to be ---- he's going to be testifying to what he observed as a doctor. He's a doctor. Then under 702, he doesn't get to opine because the rule was amended in 2000. Well, he gets to testify. He gets to testify as a treating physician, as somebody who got in, who was in there doing the surgery, examining the patient before surgery. He gets to testify as to what he observed, what he saw, what his diagnosis was, what his prognosis was. When he got in there, what did he see? Why did he do what he did? And I don't know if we're all ---- for that kind of testimony, he needs to give you, provide an expert report. First of all, there's a court order that says if he goes ---- Well, it assumes that the court order is proper. Well, the court order ---- there's no question that the Court didn't have the power to issue a scheduling order. We all ---- there's no argument here. No. I mean, the scheduling order is fine, but you can't have a court order barring a treating physician or precipient witness from having to file an expert report if it's not required. Sure you can, Your Honor. The Court can order the litigants if it's not required under 26. And there's a debate, and this circuit hasn't resolved the debate, on whether a treating physician testifying qua treating physician ---- Well, maybe we ought to resolve the debate. Pardon me? Maybe this case will resolve that debate. It may. But it really isn't on point because there was a scheduling order that trumped ---- Well, all the scheduling order said was ---- If the expert, if a doctor is going to offer opinions that are not contained in the medical records, the physician is required to tend to report. Now that ---- Well, let's assume that order was violated. Why not sanction the attorney? Fair point. That's what Rashidi suggested. Well, first of all, as I said, it's a violation of the court order. That's an option that the trial court has. And its discretion is ---- the review here is for an abuse of discretion. So the Court has to find that ---- I didn't mean for dismissal on that ground. We said in part, in part we said his testimony ought not be allowed because he didn't submit a report under the trial's order. But we also brought up the alternative grounds, which, as Mr. O'Fallon said, were never ruled upon. If he's going to get into matters of opinion testament or 702, we don't believe they're admissible. Because what he's not saying, he's going well beyond. If you look at his medical record, the one that it issues, in the record 553, 554, he says, I talked to Bob about our options. I told him what we would do. I did talk to Bob that there has been a relatively high incident of failure of the precoat as far as the bonding and possibly substrate roughness contributing to rapid osteolytic reaction. He wants to proceed with surgery. Impression, failed total precoat. There's no question that this stem got loose. There's no question he had to take the stem out. The issue is what caused it to de-bond and become loose, and whether or not that de-bonding and loosening was related to a characteristic of the stem. This gets back to my other question. He may be able to testify that there was de-bonding. There's no we would stipulate the stem. There's no dispute that the stem was looser on it. But you precluded him from testifying at all. We precluded him from offering causation testimony. Hold on. Hold on one second. Okay. There may be a question about, and this is why I was asking about does he need Dr. Does he need Mr. Lipkin, whatever his name is. Mr. Lippincott. Yes, Your Honor. Lippincott, to prove his, ultimately prove his case. I mean, it may be that the treating doctor could not opine as to the design methodology and the design, you know, the debate between this rough surface and the smooth surface and all of that. But I don't know why he couldn't certainly testify as to about what he saw and, you know, why it broke down and why it was necessary to replace it. Well, first of all, he can go ahead, Judge. Was the Dr. Gannon identified as an expert witness? He was identified as a treating physician, Your Honor. Yes. He should be a witness. Yes. I mean, he was part of their disclosures, but I don't believe. You asked him about his opinion. I did. And, in fact, if you look at the record. Why did you do that? Well, because I was a little surprised as to what he told me when I was taking his deposition in light of the disclosure that he was going to, there was no expert report. If you look at the trial record, Excerpt 369, which is pages 101 and 102 of the transcript, and I said to the doctor, okay, and did you not, did you or not, as you communicated this, in your note, this being talking about the relatively high incidence of precoat loosening, as you were talking to Dr. Opert, you were not trying to set about the mechanism of failure here. You were simply communicating to him, well, him, hey, look, there have been reports of failures of these types of stems. Is that correct? Answer, yes. All right. As you sit here today, you've not tried to set about the mechanism or tried to determine the mechanism of failure with this particular stem. Have you, Doctor? I don't think it's possible to determine the exact mechanism. Then he goes on. Later on in the deposition, after a break, there is specific testimony. And so when you ask what the prejudice is, Judge, to me as a trial counsel taking that deposition, I would have, number one, subpoenaed the doctor's records relative to his other reports of loosening. Because the issue here is why did this particular, not why stems in general loosen. Why did this stem loosen? And so now all of a sudden the doctor is saying, you know, there's two sources of particulate debris. Because this gentleman had polyethylene on the acetabular side, and we know that there's bone cement on the femoral side. There's bone cement on the stem, and there's bone cement on the canal. And so there's two sources of that debris. And he's not able to rule one in, rule one out. But now all of a sudden he's getting into that debate. And so what I would have done, had I known he was going to get into that debate, because I was surprised that he got into that debate given the disclosure that was given, I would have gone about trying to determine what his experience specifically was, what his patient population really was. I would have taken a much different deposition. And so I was left with the record that I did. In my mind, it violated the court's order. The court agreed with that, and he excluded his testimony. We also would have ---- Do you understand him to have excluded all his testimony? No. No, he did not. He excluded the testimony linking ---- So if the doctor had been on the stand, let's just assume the case had gotten to trial. Yes. What would he have been allowed to testify under that order? I believe he wouldn't. What would you have said? You know, that's fine. You know, he was a treating physician. He can testify. So what would he have been allowed to testify? What's in his medical records. Only his medical records. That's what the court's order said. And what's in his medical records was the gentleman presented, essentially, the gentleman presented to me. His stem was loose. I relayed to him, hey, look, I see these other incidents. Now, whether or not that would have been out on 403 grounds, we didn't get to. And I said, you need to be revised. That's what he could have said on the stand, not, hey, look, I believe that the debonding that occurred here was due to not anything going on in the acetabular side but only on the femoral side, and it was due to the surface features of the stem, specifically the macro texturing and the roughness of the stem. Which is the doctor that went in and actually removed it? Dr. Gannett. Dr. Gannett. So he couldn't testify to what he saw when he took it out? He didn't see that. He didn't see. You're not able to see the fact that this stem, you're not able to see the causal connection. All he had was a grossly, I think the record says a grossly loosened stem. That's all you see. You see the stem is loose. And he believes that he saw or that it was due to particulate debris. There's no dispute there was particulate debris. The issue is what caused it. And so what he's trying to do and what they want him to do, because they realize they have a gap in their proof, is to connect that gap. And so we were unfairly presented with the opportunity to try to get around that gap. So I would have taken a different deposition. But we don't even get to that point, Your Honor, if the two liability witnesses who also want to talk about causation, because I think there was a recognition that maybe we have some causation problems with our treaters, don't testify under Daubert. Now, the Court observed that it wasn't sure what kind of analysis the trial court engaged in, whether it was a straightforward Daubert analysis. What we do know is the Court was concerned about the testimony proffered by these two witnesses. We know the Court conducted extensive hearings about that testimony. He was a little bit unhappy with the way in which the report was written. A little bit. The tone of the report. A little bit. He accused the lawyers of having a hand in the report. He did. He did. I didn't know that. I was a little bit surprised to see that that was all part of the Daubert analysis. Well, look at Justice Breyer's decision in Kumho-Tyre or this trial court's decision in Lust v. Merrill Daubert. Now, when this Court observed about that trial court's observation of the witness there, that it's appropriate to have suspicions raised when a witness comes into the courtroom and comes up with opinions that are not, A, generally accepted, and, B, connected to the data that the witness himself didn't generate but that others did. And so Justice Breyer said, as to the concerns of the trial court there, it was in the Eleventh Circuit, he said, Wait a minute. Here's a witness who comes in and says, You know what? Volcano and cadera exist in vivo. And even though I don't see evidence of that and even though it's impossible for me to see evidence of that, that's what occurred here. And even though there is no consensus in the medical community about whether stems should be smooth, polished, or roughened, and even though there's not a single report of actual volcanoes, so-called volcanoes and cadera, existing on stems in vivo, and even though I can't see any of that, that's what occurred here. And I, Mr. Lippincott, a metallurgist, have solved that debate. So as Justice Breyer said, the concerns of the trial court there in Kumotair were legitimately augmented. And then we have the transcripts, as Justice Breyer said. So you have these general, so-called precise observations that caldera and volcanoes exist in stems in vivo, not in some laboratory somewhere. You have that precise general observation. And yet, well, do they actually exist in this patient? It's impossible to say. So in that case, the two general observations about the tire wear, and if these two things aren't present, that means that tire is defective. Well, how long has the tire been ridden? Well, I don't know. Well, 50 miles, 100 miles, 6,000 miles? I don't know. And so the trial court, according to Justice Breyer. What is the significance of that decision in this case? The significance is, is the trial court's suspicions were justified. trial court's suspicions, when they see an expert like you saw, Judge Rafiti, in the Lust case, who has conclusions that are not supported by the data, then it's appropriate to have concerns. It's appropriate, and this is a long-winded answer to your question, Judge Nelson. It's appropriate to wonder, what do we have here? Do we have a reliable methodology, or do we have a made-for-the-courtroom opinion by two hired guns? And that's essentially what we have. He didn't actually use the words unreliable methodology. No, he didn't, Your Honor. He was a very kind of a rough kind of approach to this determination here. Justice in Montana is a little different than perhaps justice here in Seattle. But there's no question, given the full sweep of what the judge did, it was appropriate, it was well within. Let me ask you this. Why was it, you know, the judge said this is the intersection of medicine and whatever, and he was concerned that the Lippincott didn't have medical, pure medical training as an orthopedic? There's two primary reasons. Well, why is that of any significance here? Because that wasn't the – they have the doctors. Why would the – you know, why is that essential for this guy to form an opinion? Well, two reasons, Your Honor. Number one, both of these witnesses in their report and in their deposition offered opinion testimony about medical causation, why this particular stem loosened in this individual. Number two, when you're talking about the design of a stem and whether or not macro texturing, texturing interfaces connecting to human tissue, biological, because after all, this is a natural and an artificial construct, you need to bring those two disciplines together, which frankly our experts brought to the table. So that was a concern. And so you're now looking at, as Justice Breyer said, some issue in the abstract, in that case a tire, whether tires fail in the abstract. We're looking at why this particular stem failed. And that's why that particular intersection was important. Your Honor, you know, I guess it's possible to find a doctor who has the design experience. I don't know. Maybe you're – were your experts of that kind of doctors with – They were. Design? They were. And you treat the patients as well? They do. They're from centers. In fact, you know, the comment was made – I know I'm out of my time, so if the Court would indulge me. That's fine. In not having designated Dr. Gannon as an expert witness to express causation evidence, the plaintiff would not have been able to proceed without the – with the other witnesses having been excluded under Daubert, could not have presented any causation evidence. That is the – that was the reason for the summary judgment, right? Well, the summary judgment was granted on three points. Number one, failure to warn, negligent misrepresentation, no link, no causal connection. On the negligent design and strict liability, two failures. One, failure of proof on the defect. These witnesses were excluded, so as Mr. O'Fallon conceded, without that, you don't even get to the question of a causal connection. And two, the trial court in an add-on ruling said, and I don't believe under – I do believe under Montana law that it's not sufficient to even have Dr. Gannon present some anecdotal reports, make a prima facie case to get to the jury on causation. And the point was made, Your Honor, very briefly about, you know, this guy was deemed an expert by the industry. I've been defending this industry for ten years. I have attended surgeries. I have done softens where I have put these stems in. There's no way this trial court would let me get on the stand. That's what was confronted in this trial court. He appropriately and thoughtfully thought through the issues. He even brought the witnesses out. He considered our affidavits from our people who wrote things, and he said that there's too great of an analytical gap between these general opinions and what they want to do, and so he excluded them. Thank you. Thank you very much. Thanks, Judge. You're welcome. Let me really just cover two quick things. First of all, as to the Court's order on treating physicians, His Order of Paragraph 9 said that, quote, an expert report is not required from a treating physician unless testimony to be offered by the treating physician will include opinions not expressed in medical records. When we disclosed our experts, I had this in for the treating physician because I had made a determination that based on the medical records we've talked about, he clearly had already disclosed in his medical records his opinion about causation. But I identified, and this is page 8 of my brief that's also in the record at ER 35, plaintiff also identified implanting surgeon Dr. Frank Heimberger and explaining surgeon Dr. Daniel Gannon as treating physicians who would testify about the care and treatment of Dr. Oakberg as well as their experience with the central line stem. So any notion that Mr. Dahm did not understand when he went in to take Dr. Gannon's experience with the central line stem is overstating the record. In fact, many of the questions that Mr. Dahm asked talking about cup debris was really Zimmer's defense in these cases, and they've asked every doctor about it because they're trying to set up an alternative causation for this debris other than their stem. And again, going back to Dr. Gannon's record, he does set forth those opinions in his medical records. So reasonably looking at the Court's orders and looking at those medical records, I concluded that an expert opinion under that order was not required. Let's talk for a second about the connection between the opinions offered by Mr. Lippincott and the evidence underlying it. The whole notion of volcanoes and calderas came out in 1999 when the designer of this stem and his group, Dr. Harris and Dr. Duffy, did some experiments with these stems after, frankly, they'd already been taken off the market. They were simple experiments. That is, they took the cement and put it over that macro texture outside the body because you can't see them inside the body. And what did they find when they took that apart, when they sawed it apart? They found that those indentations did not fill and, in fact, resulted in bubbles and caldera. That's the kind of information that my experts relied upon. There's a concern about, did Mr. Lippincott do testing? Well, this is like the White case. Mr. Lippincott looked at the testing done by the company internally and by their own experts and concluded, as did their own experts, by the way, that this macro texturing had a negative effect. That's what was said in that. And that's true. If you look through Mr. Lippincott and Dr. Parisian's report, what you will see quoted and specifically analyzed, just like the metabolite court said you have to do on scientific risk assessment, everything they deemed important, everything my experts deemed important in those articles and then cited the articles. You know, for one thing, the Court was concerned about a draft article, but it was a draft article taken from Zimmer's own files that a doctor had given to Zimmer. You're over your time. Go ahead. I would still need general causation testimony. Dr. Gannon could give me specific causation but not general causation. That is, he wasn't going to be the one to link up the specific design parameters with the causation. What he could say — Well, he couldn't express any opinion. You didn't identify him as an expert witness. Right. Only he could express the opinions that are in his medical records, in which here. Here's what he says in his medical records. He says, I talked at length with Bob about our options. I did talk to Bob about there had been a relatively high incident of failure with the pre-coat as far as debonding and possible surface roughness contributing to rapid osteolytic reaction. He wants to proceed with the surgery. Would you have been able to get by a motion for judgment? I would still need Mr. Lippincott to talk about general causation. I conceded that at the lower court. Yeah. I think that's a necessary part on specific causation. But I still need Mr. Lippincott to talk about generically how the various design features then the mechanism, in essence, as it relates to the design. What Dr. Gannon can say is, here's what I looked at. I looked up this. I mean, this is like these other pre-coats. But I think you really need Dr. Lippincott. And I believe I conceded that at the oral argument at the summary judgment. Thank you so much. I'll let you go over your time. We appreciate your argument. The matter will be submitted.
judges: D.W. Nelson, Paez, Rafeedie